**In re SABIN ORAL POLIO VACCINE PRODUCTS LIABILITY LITIGATION.**

Master File No. MDL 780.

United States District Court,
D. Maryland.

July 12, 1990.

Marc Moller, Kreindler & Kreindler, New York City, and Stanley Kops, Adler & Kops, Philadelphia, Pa., for plaintiff.

Rupert Mitsch and Julie Zatz, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (Ann Wion, Assoc. Chief Counsel For Drugs and Biologics, Food and Drug Admin., Rockville, Md., of counsel), for defendant.

## OPINION

MOTZ, District Judge.

Seven cases have been transferred to this District pursuant to 28 U.S.C. § 1407 (1988) for resolution of their common factual and legal issues relating to the question of liability.[1] Plaintiffs are victims of poliomyelitis, having contracted the disease as a result of the administration of Orimune, an oral polio vaccine manufactured by Lederle Laboratories, Inc. Four of the plaintiffs took the vaccine themselves, and the other three were exposed to persons who had taken the vaccine. In these actions brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1988), plaintiffs allege that officials of the Division of Biologic Standards ("DBS") were negligent in issuing a license to Lederle to manufacture Orimune, in approving for use the virus seeds from which the doses of vaccine causing them injury were derived, and in

---

1. The cases are as follows:

   *Baker v. United States,* Civil No. JFM–88–3686 (transferred from the Southern District of California);

   *Berkovitz v. United States,* Civil No. JFM–88–3280 (transferred from the Western District of Pennsylvania);

   *Joy v. United States,* Civil Nos. JFM–90–1921 and JFM–90–1934 (transferred from the Northern District of Ohio);

   *Kaye v. United States,* Civil No. JFM–88–3322 (transferred from the Southern District of Ohio, Eastern Division);

   *Miller v. United States,* Civil No. JFM–87–3175 (originally filed in the District of Maryland);

   *Musgrove v. United States,* Civil No. JFM–88–3162 (transferred from the Northern District of Florida);

   *Parulski v. United States,* Civil No. JFM–88–3449 (transferred from the Middle District of Pennsylvania).

   Section 1407 provides only for the transfer and consolidation of actions for pretrial proceedings. However, counsel have agreed to a transfer of these actions to Maryland under 28 U.S.C. § 1404(a) for the purpose of a consolidated trial on the factual issues relating to liability which remain to be decided in the wake of my rulings in this Opinion. Of course, the legal effect of any factual findings which I make will be decided (in connection with such issues as negligence *per se* and proximate cause) by the transferor courts under the state law which they determine to be applicable to the particular cases before them. *See* 28 U.S.C. § 1346(b) (1988).

approving for release the vaccine lots containing those doses.[2] Discovery on the liability issues has been completed, and the parties have filed cross motions for summary judgment.

## I. BACKGROUND

Poliomyelitis is a disease of the central nervous system. It is of three types. Type I can be contracted only from a Type I virus, Type II only from a Type II virus and Type III only from a Type III virus. Each of the plaintiffs here suffers from the third type of the disease.

In 1955 a vaccine against each type of polio, developed by Dr. Jonas Salk, was licensed for production and use in the United States. This vaccine was an inactivated polio vaccine ("IPV") derived from a virus which had been killed. The use of the Salk vaccine dramatically decreased the incidence of polio but did not eradicate it. Between 1958 and 1961, there were nearly 19,000 cases of the disease in the United States. Thirteen thousand people were paralyzed and over 1,000 people died from it.

While Dr. Salk had been developing his inactive vaccine, other scientists, including Dr. Albert Sabin, had been working on an oral polio virus vaccine ("OPV"). OPV is produced from a live virus attenuated but not killed during the production process. Scientists perceived that OPV might have several advantages over IPV. It was relatively less costly and, as its name reflects, it could be taken orally whereas IPV required three initial inoculations followed by at least one subsequent booster shot. Moreover, OPV permitted the creation of "herd immunity" because a person who has not been administered the vaccine can pick up immunity from one who has been vaccinated. In contrast, persons who are immunized with IPV can still be linked in the chain of infection; although immunized themselves against the disease, they can serve as carriers of the wild polio virus and pass it on to others. Of course, despite these advantages, there is an inherent risk in the use of OPV. Like other live virus vaccines (such as those used for smallpox and yellow fever), OPV stimulates immunity by inducing a mild infection in vaccinees. Thus, a person vaccinated with OPV or a person who comes into close contact with the vaccine's virus (usually by exposure to the vaccinated person) may develop polio.[3]

On June 30, 1958, the Surgeon General of the United States appointed an ad hoc committee to consider whether, in light of the continued incidence of polio after the institution of the vaccination program based upon the Salk vaccine, an effective OPV program could and should be developed. There were six members of the committee. The chairman was the director of DBS, and the five other members were academicians who had been actively involved in research on polio and polio vaccines. The purposes of the committee were to (1) assist in the selection of the virus strains to use in the manufacture of an OPV, (2) evaluate data pertaining to the efficacy and safety of vaccines produced from the selected strains and (3) develop regulations for governing the licensing and manufacturing of OPV.

During 1958 and 1959 twenty field trials involving the use of OPV were conducted throughout the world. The most extensive trials, in which vaccines derived from the strains developed by Dr. Sabin were used, were conducted in Eastern Europe and the Soviet Union. By the end of 1959 over 15 million persons had been vaccinated in the Soviet Union alone. Dr. Dorothy Horstmann, an internationally respected epidemiologist, spent two months in the Soviet Union and Eastern Europe under the aus-

---

**2.** DBS was transferred from the National Institutes of Health to the Federal Drug Administration and renamed the Bureau of Biologics in 1972. In 1984 the Bureau of Biologics was renamed the Office of Biologics Research and Review. "DBS" is used in this Opinion to connote the Division of Biologic Standards and its successors.

**3.** The extent of the risk has been demonstrated by the actual experience under the OPV program. The annual number of cases of polio in the United States has averaged less than ten per year or one case for every 2.6 million doses of vaccine distributed.

pices of the World Health Organization, conducting her own review of the methodology and results of the Soviet tests. After completing her studies, she reported to the ad hoc committee her conclusion that the tests had been properly conducted and that vaccines derived from the Sabin strains were safe and effective. The same conclusion was confirmed by other laboratory and field tests, which were subjected to critical scrutiny at a series of international conferences in which members of the ad hoc committee participated. After reviewing all of the information available to it, the committee recommended to the Surgeon General without qualification that the Sabin Type I and Type II strains be used. Although the committee noted a concern that the Sabin Type III strain was genetically less stable, it also unanimously recommended that this strain was safe and effective for use.

On August 24, 1960, the Surgeon General, acting upon the recommendation of the ad hoc committee, declared that OPV was suitable for use in the United States and released the committee's recommendations concerning the use of the Sabin strains. In 1961 DBS adopted regulations, along lines recommended by the ad hoc committee, governing the issuance of manufacturing licenses and the approval and release of vaccine. In 1962 Lederle was licensed by DBS to manufacture OPV, and it is today the only manufacturer of polio vaccine in the United States.

## II. PLAINTIFFS' CLAIMS

OPV is produced through three phases. First, wild polio virus is obtained and attenuated by passage through animal hosts. The result of this process is a "strain." A portion of the strain is then inoculated into monkey kidney cell cultures. The resulting

progeny is the "seed." "Pools" of vaccine, from which "lots" are manufactured, are then developed from the seeds.[4]

DBS regulations address these three phases of vaccine production. First, the strains being used by a manufacturer must be approved. This involves (1) the proper identification of the strains, (2) the presentation of epidemiological data demonstrating that vaccines produced from the strains have been used in an extensive clinical field trial without harmful effect and (3) the submission of data showing that vaccines produced from the strains have successfully passed mandated laboratory tests for safety and potency. *See* 42 C.F.R. § 73.110(b)(1) and (2) (1962).[5] Second, each seed must be demonstrated to be free of extraneous microbial agents and to have successfully passed the mandated laboratory safety tests. *See* 42 C.F.R. § 73.110(b)(3) and (4) (1962). Third, vaccine pools must also successfully pass laboratory tests and clinical field trials demonstrating their safety and potency. *See* 42 C.F.R. §§ 73.114, 73.115, 73.117 (1962).

Plaintiffs here contend that DBS officials violated the governing regulations at every stage of the production process. According to plaintiffs, DBS acted improperly in (1) issuing a product license to Lederle on the basis of inadequate epidemiological data and laboratory test results which demonstrated that Lederle's original strains and seeds were not sufficiently safe, (2) approving for use and/or not retesting the seeds from which the doses injuring them were derived and (3) approving for release the specific lots containing the injurious doses. The parties' summary judgment papers do not address the particulars of the third category of plaintiffs' claims, and consideration of those claims will be deferred until a later stage of the litigation.[6]

---

4. A lot of vaccine may be derived from one or more pools. Pools initially contain only one of the three types of polio vaccine and, at this stage of manufacture, are referred to as "monovalent" pools. Type I, Type II and Type III monovalent lots are then commingled in order to produce a lot from which a single dose can be derived, which will provide immunity against all three

types of polio. The resulting mixture is referred to as a "trivalent" pool.

5. The regulations are cited as they were originally promulgated. The now appear in 21 C.F.R. §§ 630.10–630.17 (1989).

6. Because of the overlapping nature of the legal issues presented, it is not feasible to organize this Opinion by analyzing plaintiffs' specific

## III. DISCRETIONARY FUNCTION EXCEPTION

The government has moved for summary judgment on the general ground that the challenged actions of DBS officials fall within the "discretionary function" exception to the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a) (1988). The parameters of that exception have been set by *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), one of the cases which is now included in this multidistrict litigation upon its remand from the Supreme Court. In brief, the Supreme Court ruled in *Berkovitz* that in order for the action of a government official to constitute the exercise of a discretionary function not actionable under the Tort Claims Act, it must involve the making of a *choice* and the choice must involve a matter of *policy, i.e.* a matter involving a political, social or economic judgment. *Id.* at 536–37, 108 S.Ct. at 1958–59. The government contends that policy choices are inherently involved in the evaluation of epidemiological data concerning the success of a vaccination program and in any decision concerning vaccine neurovirulence

(whether made in the context of approving strains, seeds or the release of lots).

### A. *Evaluation of Epidemiological Data*

42 C.F.R. § 73.110(b)(2)(i) provides as follows:

(2) Poliovirus strains shall not be used in the manufacture of Poliovirus Vaccine, Live, Oral, unless, (i) data are submitted to the Surgeon General which establish that each such strain is free of harmful effect upon administration in the recommended dosage to at least 100,000 people susceptible to poliomyelitis, under circumstances where adequate epidemiological surveillance of neurological illness has been maintained.... [7]

■ Under the decision in *Berkovitz*, it is clear that the discretionary function exception does not apply to DBS' actions under this provision if (1) DBS did not make a determination as to whether data had been submitted as required, or (2) it licensed Orimune after having found that the required data had not been submitted. The Supreme Court has expressly held that the exception would not apply in either of these instances. *Berkovitz*, 486 U.S. at 543–44, 108 S.Ct. at 1962–63.[8] However, extensive

claims in order. Therefore, it may be helpful to provide an outline of those claims and to indicate in brackets the section of the Opinion in which they are addressed.

1. Approval of strains
   a. Failure of Lederle as manufacturer to submit any data [Footnote 9]
   b. Submission of insufficient epidemiological data under § 73.110(b)(2)(i) [Part III A]
   c. Failure to provide proper neurovirulence data under § 73.110(b)(1)(iii) [Footnote 9]
   d. Failure of initial lots to pass neurovirulence tests required by § 73.110(b)(2)(ii) [Parts III B; IV A]
   e. Failure of initial lots to meet consistency of manufacture requirement of § 73.116(c) [Footnote 18]
   f. Failure to evaluate neurovirulence of seeds from which initial lots were manufactured. [Footnote 12]
2. Use of "SOM" as a seed without demonstrating its compliance with § 73.110(b)(3) and (4) [Part IV B]
3. Use of seed 45 B 85
   a. Failure to test the seed and the initial lots produced from the seed under the test regimens of § 73.114(b)(1)(i) and (ii) [Part V A]

   b. Failure of initial lots to meet the neurovirulence requirements of § 73.114(b)(1)(iii) [Parts III B; V B]
   c. Failure of initial lots to meet the consistency of manufacture requirement of § 73.116(c) [Footnote 18]
   d. Failure to retest the seed for neurovirulence in violation of § 73.110(b)(5) [Footnote 13; Part V B]
   e. Failure to subject strain, from which the seed developed, to tests of § 73.110(b)(3) and (4) [Footnote 16]
4. Use of seed 45 B 165
   a. Improper issuance of product license to Pfizer, Ltd. [Part VI]
   b. Violation of § 630.13(a) [Part VI]
5. Irregularities in the release of the lots containing the injurious doses [Not addressed except for government's discretionary function defense. *See* Part III B]

7. In 1968, § 73.110(b)(2)(i), recodified at 21 C.F.R. § 630.10(b)(2)(i), was amended to require that vaccine from a strain be field tested upon 1,000,000, instead of 100,000 people. *See* 33 Fed.Reg. 4623 (1968).

8. The Court's holding on this point was made in the context of a discussion of whether Orimune itself had been shown to comply with regulatory

discovery has now been completed, and plaintiffs point to nothing in the record to support the proposition that DBS was guilty of any such misconduct. To the contrary, the record is uncontradicted that the Surgeon General's ad hoc committee and DBS both reviewed the epidemiological data generated from the mass vaccination programs in the Soviet Union and found that they fully met the requirement of § 73.110(b)(2)(i). Indeed, the Soviet studies provided the provenance of the regulation itself. *See Schindler v. United States,* No. 77–72707 DT, slip. op. at 15 (E.D.Mich. Dec. 5, 1984), *aff'd,* 798 F.2d 1416 (6th Cir.1986) (Table).

■ Thus, plaintiffs' only potentially viable contention concerning § 73.110(b)(2)(i) is that DBS erred in finding that the data from the Soviet studies satisfied the requirements of the section. *See Berkovitz,* 486 U.S. at 544–45, 108 S.Ct. at 1962–63. The question therefore becomes whether DBS' determination of compliance involved the exercise of policy judgment. I find that it did. Section 73.110(b)(2)(i) is exceedingly broad in its terms, requiring DBS to make a determination whether a strain is

"free of harmful effect" after being tested under circumstances where there has been "adequate" epidemiological surveillance. Unless a statute or regulation sets an independent defining point of reference (as in the case of § 73.114(b)(1)(iii), *see infra,* Part III B), determinations of "harm" and "adequacy" necessarily involve an element of judgment rooted in considerations of social policy. For example, although a minor skin irritation resulting from a vaccination may in a sense be deemed to be "harmful," it clearly is not "harmful" if measured against the benefits provided by immunization from disease. Likewise, although any professional epidemiologist responsible for conducting a surveillance would find "inadequate" a failure of one of his or her subordinates to keep perfect monitoring records, the "adequacy" of an epidemiological survey as a whole must be measured by all of its parts and in relation to the practical possibility of obtaining more reliable results by the conducting of another survey. These determinations were entrusted without limitation to DBS, and they are immune from judicial review under 28 U.S.C. § 2680(a).[9]

safety standards, *i.e.,* whether there had been compliance with § 73.110(b)(2)(ii). However, the Court's reasoning equally applies to the question of whether DBS complied with § 73.110(b)(2)(i) in regard to the submission and review of epidemiological data.

It perhaps should be noted that one of the arguments made by the plaintiff in the Supreme Court now appears to be somewhat perplexing: that DBS had issued Lederle's product license without having received the test data required by the regulations (presumably § 73.110(b)(2)(ii)). *See Berkovitz,* 486 U.S. at 542–43, 108 S.Ct. at 1961–62. There is no question that, in fact, Lederle did submit test data concerning Orimune to DBS. Apparently, Berkovitz' contention was based upon his interpretation of § 73.114(b)(1)(iii) as requiring strictly numerical results no greater than the results obtained on the reference virus in comparative tests. *See infra,* Part III B; *see also infra* note 12 (regarding plaintiffs' contention that Lederle was required to submit test data *re* seeds). If that interpretation were correct (which I find it not to be), it would be true that DBS had issued Lederle's product license without having received the required test data. In any event, it is entirely understandable that the parties have framed the issues before me in a slightly different manner than they presented them to the

Supreme Court since the record has now been more fully developed.

9. Plaintiffs make an ancillary argument that § 73.110(b)(2)(i) imposes a mandatory duty upon DBS to obtain adequate epidemiological data from the manufacturer itself. Nothing in the language of the regulation supports this claim. It merely requires in the passive voice that "data are submitted to the Surgeon General." Furthermore, it would be pointless to require a manufacturer to resubmit data which was already readily available to DBS. To the extent that DBS implicitly interpreted § 73.110(b)(2)(i) as not imposing such a requirement, its interpretation was not plainly erroneous or inconsistent with the regulation. Therefore, it must be upheld. *See generally Young v. Community Nutrition Inst.,* 476 U.S. 974, 981–982, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). The same is true of DBS' interpretation of § 73.110(b)(1)(iii) as applying only to data from neurovirulence tests performed on the original Sabin strains by Dr. Sabin and the government. In any event, any claim which plaintiffs might have under § 73.110(b)(1)(iii) concerning data from neurovirulence tests performed by Lederle would simply parallel their claim under § 73.110(b)(2)(ii).

## B. *Neurovirulence Determinations*

■ Section 73.114(b)(1) is the regulation which governs neurovirulence testing. It is by its own terms directly applicable only to the testing of vaccine pools and lots. However, it is incorporated by reference into § 73.110(b)(2)(ii) and § 73.110(b)(4), pertaining to the approval of strains and seeds, respectively. Thus, it is germane to many of the claims which plaintiffs are asserting.

Sections 73.114(b)(1)(i) and (ii) establish specific test regimens for the intrathalamic and intraspinal inoculation of given numbers of monkeys. The sections are mandatory in their terms, and the government does not contend that they involve the exercise of a discretionary function.[10] The government does contend, however, that the ultimate determination of neurovirulence to be made under § 73.114(b)(1)(iii) is a discretionary function. That section provides that, after specified laboratory tests have been conducted,

[a] comparative evaluation shall be made of the evidence of neurovirulence of the virus under test and the NIH Reference Attenuated Poliovirus with respect to (a) the number of animals showing lesions characteristic of poliovirus infection, (b) the number of animals showing lesions other than those characteristic of poliovirus infection, (c) the severity of the lesions, (d) the degree of dissemination of the lesions, and (e) the rate of occurrence of paralysis not attributable to the mechanical injury resulting from inoculation trauma. The virus pool under test is satisfactory for poliovirus vaccine manufacture only if at least 80 percent of the animals in each group survive the observation period and if a comparative analysis of the test results demonstrate that the neurovirulence of the test

virus pool does not exceed that of the NIH Reference Attenuated Poliovirus.

The parties take diametrically opposed positions as to the meaning of this section. On the one hand, the government argues that the determination of neurovirulence constitutes the exercise of a discretionary function because it necessarily involves consideration of an underlying policy concern that sufficient amounts of vaccine be available to make the national OPV program viable. Plaintiffs, on the other hand, contend that the section deprives DBS officials of the authority to exercise any professional judgment in determining neurovirulence, converting that determination into the essentially clerical function of comparing the numerical test results of the vaccine under scrutiny with the numerical test results of the reference virus.[11]

Neither of these interpretations is correct. While the availability of vaccine supply certainly is a matter of essential importance to a public health program, the availability of vaccine supply is not listed in § 73.114(b)(1)(iii) or any other regulation as a factor to be taken into account in the neurovirulence determination. The accommodation of potentially conflicting interests between assuring a supply of vaccine to protect the public as a whole and subjecting individual members of the public to an increased risk of injury does involve a policy choice. However, this choice was made by the adoption of the mandate, in the regulations themselves, that no vaccine be approved unless it is at least as safe as the specified reference. In effect, the regulations substitute a purely "scientific" judgment, *i.e.* a comparative evaluation of the neurovirulence properties between the tested and the reference virus, for the policy judgment which the government now argues gives rise to the discretionary function exception. Therefore, if during the

---

**10.** Further, the government does not deny that from 1962 to 1968 (the period during which seed 45 B 85 was tested) DBS required OPV manufacturers to follow different test regimens than those prescribed by § 73.114(b)(1)(i) and (ii). The government does, however, assert that this deviation from the regulatory mandate does not give rise to a viable claim. The govern-

ment's contentions in that regard are discussed in part V A, *infra.*

**11.** Section 73.111 mandates that a Type I virus be used as the comparative reference on the monkey neurovirulence tests. DBS chose a particular Type I strain as the reference in 1962, and the same reference has been used ever since.

course of administering the OPV program, DBS officials concluded that safety criteria had to be lowered in order to assure vaccine availability, it was incumbent upon them to seek a change of the regulations through the public amendment process in which the views of all interested parties could be heard.

Plaintiffs' interpretation of § 73.114(b)(1)(iii) is, on the other hand, far too restrictive. Neurovirulence testing is not merely a numbers game but requires the exercise of sound scientific judgment. Section 73.114(b)(1)(iii) calls for a "comparative evaluation," not simply a comparison of numerical test scores. Moreover, as experience accumulates and knowledge increases, approaches to determining neurovirulence change. DBS officials have accordingly interpreted § 73.114(b)(1)(iii) as authorizing them to weigh various indicia of neurovirulence differently in accordance with then contemporaneous professional views of the relative significance of each of the factors. Far from being "plainly erroneous" or "inconsistent with the regulation," this interpretation permits the flexibility reasonably necessary for the exercise of sound scientific judgment. *See generally Young v. Community Nutrition Inst.,* 476 U.S. at 981–82, 106 S.Ct. at 2364–65; *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. at 413–14, 65 S.Ct. at 1217. This interpretation has already been judicially upheld. *See Griffin v. United States,* 500 F.2d 1059, 1065 (3d Cir.1974). Thus, although the decisions made by DBS officials under § 73.114(b)(1)(iii) do not constitute the exercise of a discretionary function immune from judicial review, upon such review they are to be judged in their fullness rather than dissected by an auditor's pen.

## IV.  ORIGINAL LICENSURE ISSUES

For the reasons stated, the government is entitled to summary judgment under the discretionary function exception on plaintiffs' claim for the alleged nonsubmission of epidemiological data under § 71.110(b)(2)(i). However, the government is not entitled to summary judgment under the discretionary function exception on any claim based upon the alleged failure of seed material or vaccine lots to meet the neurovirulence requirements of § 73.114(b)(1)(iii). It remains to be considered whether summary judgment for either side on any of plaintiffs' claims is otherwise appropriate.

### A.  *Results of Neurovirulence Tests*

■ Plaintiffs assert that the initial lots of vaccine which Lederle submitted in support of its original product license failed the neurovirulence tests. They claim that even assuming (contrary to their contention) that DBS officials are authorized to give differing weights to the various indicia of neurovirulence under § 73.114(b)(1)(iii), they are entitled to summary judgment on this claim.[12]

Plaintiffs point to various test results in support of this claim. Monkeys inoculated with vaccines from three of the Type III lots (Lots 314, 315 and 317) on the intrathalamic tests administered by Lederle received scores higher than the scores given to any monkey tested with the reference virus. The same was true as to one monkey inoculated with vaccine from a Type I lot (Lot 117) on an intrathalamic test administered by Lederle, and as to monkeys inoculated with vaccine from four Type III lots (Lots 313, 314, 315 and 316) on Lederle's intraspinal tests. DBS performed its own intrathalamic tests on Lederle's Type III vaccine, and the score of at least one monkey inoculated with vaccine from each of the initial five Type III lots (Lots 313, 314, 315, 316 and 317) was higher than the score given to any monkey inoculated with the reference virus. Moreover, DBS has

---

**12.**  Plaintiffs also claim in the statement of facts in support of their motion for summary judgment that DBS was required, when approving Lederle's *strains* and issuing a product license to it, to review test results on the *seeds* which Lederle used in manufacturing its initial lots of vaccine. This claim is without basis. In determining the safety of the strain, DBS was required to evaluate only the end product—the vaccine—under § 73.110(b)(2)(ii). Of course, different issues are presented by plaintiffs' contention that DBS improperly approved or failed to retest the particular seed from which the vaccine doses injuring five of them were derived. These issues are discussed in Part V, *infra.*

conceded that three of the five Type III lots submitted in support of its original license application (Lots 314, 315 and 317) would not have passed under the criteria of the "Maloney Table," a statistical model used by DBS from 1963 to 1972 (after DBS issued Lederle's original product license) which allegedly liberalized the neurovirulence standards.

Considered in the aggregate, these facts are sufficient to require the government to come forward with evidence demonstrating that the determination made by DBS officials that the vaccine produced from Lederle's strain met the neurovirulence requirements of § 73.114(b)(1)(iii), as incorporated into § 73.110(b)(2)(ii). However, because a neurovirulence determination made under § 73.114(b)(1)(iii) requires a qualitative comparative evaluation, not merely a numerical comparison, (*see supra*, Part III B), the test results do not by themselves establish plaintiffs' entitlement to summary judgment.

### B. *Use of "SOM" As A Seed*

Plaintiffs have also asserted a claim concerning Lederle's use of SOM, a poliovirus strain, for manufacturing vaccine. They contend that DBS should not have issued a product license to Lederle because Lederle never demonstrated that SOM was free of extraneous microbial agents as required by § 73.110(b)(3) or that it had passed the neurovirulence tests of § 73.114(b)(1) (incorporated by reference into § 73.110(b)(4)). The government asserts that DBS has interpreted its regulations as permitting the use of an approved strain for any purpose and that § 73.110(b)(3) and (4) do not apply to strains which are used as seeds. Although it does not appear that this interpretation of the regulations is plainly erroneous or inconsistent with their terms, I will defer ruling upon the issue until the parties have addressed it more thoroughly.[13]

### V. SEED 45 B 85

Five of the plaintiffs (those in the *Baker*, *Berkovitz*, *Kaye*, *Miller* and *Parulski* cases) were injured by doses contained in vaccine lots derived from seed 45 B 85. Plaintiffs contend that DBS improperly permitted that seed, which was first introduced in 1964, to be used in vaccine manufacturing.[14]

### A. *Change in Test Regimens*

As originally adopted in 1961, § 73.114(b)(1)(i) and (ii) required manufacturers to perform intrathalamic tests with ten monkeys inoculated each at the $10^0$ and $10^{-1}$ dilutions, and intraspinal tests with five monkeys inoculated each at the $10^0$, $10^{-1}$, $10^{-2}$, $10^{-3}$ and $10^{-4}$ dilutions. In October 1962, without amending the regula-

---

**13.** Plaintiffs might well also face an insurmountable difficulty on the issue of causation as to this claim. Only Type I and Type II SOM were used as seeds for the manufacture of vaccine, and, as indicated above, all of the plaintiffs contracted Type III polio.

I might also note incidentally that a broader issue of causation exists in regard to all of plaintiffs' claims pertaining to the original licensing of Lederle. The government has represented that by 1976 (when the earliest vaccine lot containing a dose injuring one of the plaintiffs here was manufactured) virtually every nation in the civilized world had adopted an OPV program. It would seem that if it is ultimately found that DBS was negligent in originally issuing a product license to Lederle, the government should be given the opportunity to attempt to demonstrate that by 1976 Lederle would have been licensed to manufacture OPV anyway. That fact, if proven, might constitute a defense, depending upon the law of proximate cause applicable to a particular case. *See* 28 U.S.C. § 1346(b) (1988).

**14.** The government contends that the regulations do not direct it to approve or disapprove a particular seed but rather only to approve or disapprove vaccine lots. This contention is based upon (1) the absence of any mandate in § 73.110(b) that results of tests on seed virus be submitted to DBS, and (2) the presence of a mandate in § 73.116(g) that results of tests performed on vaccine lots be submitted to DBS. This issue needs to be further explored. It may be that, notwithstanding the language of the regulation itself, DBS has followed a policy of approving seeds. In that event, the government might well be liable for any negligent conduct in which DBS engaged in implementing that policy. *Cf. Berkovitz*, 486 U.S. at 547, 108 S.Ct. at 1964. Moreover, even if DBS does not approve the initial use of seeds, it might nevertheless be liable under § 73.110(b)(5) for negligently failing to require the retesting of seeds. Likewise, if DBS was negligent in requiring Lederle to alter the test regimens specified in § 73.114(b)(1)(i) and (ii), this would seem to constitute an independent ground for liability.

tions, DBS began to require vaccine manufacturers to use modified test regimens. Under these regimens intrathalamic tests were to be given to thirty monkeys inoculated at the $10^0$ dilution, and intraspinal tests were to be given to five monkeys inoculated at each the $10^0$, $10^{-3}$ and $10^{-4}$ dilutions. It was not until 1968 that the regulations were amended to incorporate these modified regimens. They remain in effect today.

The government concedes that the terms of § 73.114(b)(1)(i) and (ii) were mandatory and that DBS's deviation from their dictates did not itself constitute the exercise of a discretionary function. However, the government contends that DBS properly modified the test regimen pursuant to § 73.118, the "equivalent methods" provision of the regulations. This contention is unpersuasive. Section 73.118 requires that before any modification may be made of a manufacturing method or the conditions under which it is conducted, the Surgeon General must make a finding, and make his or her finding a matter of official record, that the modification will provide at least as equal assurance of the safety, purity and potency of OPV as do the existing standards. The only document to which the government points as evidencing that the requisite finding was made is a letter dated October 23, 1962 from the director of DBS notifying manufacturers of the new test regimens. Although the letter at least implicitly reflects DBS' view that the modified regimens are advisable, it does not contain any official finding or otherwise reflect that it is implementing a modification made pursuant to § 73.118.[15]

Nevertheless, plaintiffs are not entitled to summary judgment on this claim. As indicated above (*see supra,* part IV B), DBS is authorized under § 73.114(b)(1)(iii) to exercise scientific judgment in weighing the neurovirulence factors. In this case, it implemented the change in the test regimens (which increased the number of monkeys tested intrathalamically) because of its view that intrathalamic tests provide more discriminating data than do intraspinal tests concerning a vaccine's neurovirulence. Although DBS may technically have breached the regulations by not seeking to amend § 73.114(b)(1)(i) and (ii) to reflect its new test regimens or by not adopting those regimens as an "equivalent method" under § 73.118, DBS cannot be said to have breached a standard of reasonable care in establishing tests which it deemed to yield more complete and reliable information. Thus, if DBS was not negligent in exercising its judgment in determining the neurovirulence of a seed or lot of vaccine under § 73.114(b)(1)(iii), it was not negligent in substituting its modified test regimens for the test regimens prescribed by § 73.114(b)(1)(i) and (iii). To hold otherwise would elevate form over substance and, in effect, impose tort liability upon the government merely because of DBS' failure to make a formal finding of equivalency under § 73.118 or to obtain a formal amendment in the regulations before 1968. This is not the intent of the Federal Tort Claims Act. *See Jayvee Brand, Inc. v. United States,* 721 F.2d 385, 391–92 (D.C. Cir.1983).

B. *Results of Neurovirulence Tests*

■ In addition to attacking the test regimens which were followed, plaintiffs also challenge DBS' neurovirulence findings concerning seed 45 B 85 under the standards set by § 73.114(b)(1)(iii).[16] The tests

---

15. In 1975 DBS did act pursuant to 21 C.F.R. § 630.18 (the successor to 42 C.F.R. § 731.118) to substitute Macaca cynomolgus monkeys for Macaca mulatto monkeys for use in neurovirulence tests. On this occasion formal notice was published in the Federal Register of the finding of equivalency made by the Commissioner of Food and Drugs (previously the Surgeon General of the Public Health Service). *See* 40 Fed.Reg. 8804 (1975). Section 630.18 was deleted in 1984, when the FDA consolidated all of the equivalent methods provisions in 21 C.F.R. Parts 610–680 into one section, 21 C.F.R. § 610.9. *See* 49 Fed.Reg. 15186–87 (1984).

16. In the statement of facts in support of their motion for summary judgment, plaintiffs make an ancillary contention that DBS improperly failed to test for neurovirulence the strain from which seed 45 B 85 was developed. Plaintiffs cite § 73.110(b)(4) in support of this contention. By its terms, that section applies to seeds, not strains used to manufacture seeds. Likewise, § 73.110(b)(3), which plaintiffs suggest requires that the strain in question be shown to be free

conducted on the seed itself apparently did not result in scores any higher than those obtained from tests conducted on the reference virus. Rather, plaintiffs rely upon test results indicating allegedly unacceptably high scores on intrathalamic or intraspinal tests conducted by Lederle or DBS on the initial vaccine lots manufactured from seed 45 B 85. Again, these results—although requiring explanation by the government—do not establish that DBS was negligent as a matter of law since § 73.114(b)(1)(iii) does not mandate a mere numerical comparison but confers discretion upon DBS officials to exercise their scientific judgment in making neurovirulence determinations.[17]

The record must also be further clarified concerning whether DBS was under a duty to consider the initial lots manufactured from seed 45 B 85 at all in determining the neurovirulence of the seed. Assuming that DBS is required by regulation to approve or as a matter of internal policy does approve the initial use of seeds (see supra, note 14), § 73.114(b)(4) does not by its terms require DBS to consider vaccine lots manufactured from a seed in determining the seed's neurovirulence. This question, however, may not ultimately prove to be critical if plaintiffs are able to establish that, regardless of the initial approval of seed 45 B 85, DBS officials were negligent in not retesting the seed after being provided the results of the tests on the initial lots, which allegedly show excessive neurovirulence.[18] These issues, as well as the question of whether subsequent tests on seed 45 B 85 would have shown excess neurovirulence, have not yet been addressed by the parties.

## VI. SEED 45 B 165

Plaintiffs' final claims relate to seed 45 B 165, which was the source of the vaccine lots containing the doses injuring the plaintiff in the *Musgrove* case and apparently injuring the plaintiff in the *Joy* case.[19] Lederle obtained the original source material for the seed from Institut Merieux, a French vaccine manufacturer, which had obtained the material from Pfizer, Ltd., a British manufacturer. Pfizer was at one time licensed to manufacture OPV in the United States, but it stopped its distribution of the vaccine in 1977.

---

of extraneous microbial agents, applies only to seeds.

17. The area of discretion open to DBS officials under the regulations does not, of course, include the authority to consider the policy factor of vaccine availability. *See supra*, Part III B. Test results aside, there is some independent evidence (including the affidavits submitted by the government in this litigation supporting its discretionary function defense) that DBS officials did engage in a *de facto* liberalization of neurovirulence criteria because of a concern for the availability of vaccine during the period from 1963 to 1972 (when seed 45 B 85 was approved). *See Griffin v. United States*, 351 F.Supp. 10, 33 (E.D.Pa.1972), *aff'd*, 500 F.2d 1059 (3d Cir.1974). Although this concern is understandable, if DBS officials considered a factor that was immaterial under the regulations in making neurovirulence determinations, they acted negligently in the eyes of the law, however responsible their decisions may have been from the perspective of public health administration.

18. Plaintiffs contend that DBS should have disapproved use of seed 45 B 85 even if only one of the initial five lots derived from the seed showed excessive neurovirulence. They likewise contend that DBS should have disapproved Lederle's strains if only one of the initial five lots submitted by Lederle showed excessive neurovirulence. These contentions are based upon § 73.116(c), which does impose a requirement that five consecutive pools of a vaccine pass the neurovirulence tests. However, this requirement is intended to assure consistency in the *manufacturing* process, and DBS has interpreted it as applying only to the release of lots, not to the approval of strains or seeds. DBS' interpretation is neither plainly erroneous nor contrary to the terms of the regulations. To the contrary, it seems to be eminently correct. If the requirement of § 73.116(c) had been intended to apply to the approval or retesting of seeds, it could have been incorporated into § 73.110(4) or § 73.110(b)(5). Similarly, if the requirement had been intended to apply to the approval of strains, it could have been incorporated into § 73.110(b)(2)(ii).

19. The *Joy* case was filed on March 21, 1990, and discovery has not yet been conducted on the issues particular to it. However, the plaintiff in the *Joy* case was administered vaccine on or about March 30, 1987, and seed 45 B 165 was introduced in 1983. All vaccine presently being distributed in the United States is derived from it.

■ Plaintiffs' first claim is that there were irregularities in the issuance of a product license to Pfizer. In addition to making the same contention regarding the non-submission of adequate epidemiological data under § 73.110(b)(2)(i), which they make in regard to Lederle, plaintiffs assert that Pfizer improperly conducted clinical field tests under § 73.117 with vaccine lots which were derived from pools which had failed the neurovirulence tests of § 73.114(b)(1). The government has not disputed this fact. However, plaintiffs have made no showing that DBS' approval of Lederle's use of seed 45 B 165 was in any way related to the original licensing of Pfizer. Therefore, the government is entitled to summary judgment on this claim.

■ Plaintiffs' second claim concerning seed 45 B 165 is that vaccines produced from it "represent ... more than five tissue culture passages from the original strain." If that is true, use of the vaccine is prohibited by 21 C.F.R. § 630.13(a).[20] Plaintiffs' claim turns upon the question of whether the technique known as "plaque purification," which was used by Pfizer in its manufacturing process, constitutes a "tissue culture passage." DBS has determined that it is not, and that the history of seed 45 B 165 reflects that the seed is only three tissue culture passages removed from the original strain material. DBS' determinations in these respects may well be correct. However, the government has moved for summary judgment only on the ground that DBS' decisions involved the exercise of a discretionary function. No policy consideration is implicated in the resolution of the plaque purification issue except, perhaps, a concern for vaccine availability which DBS was foreclosed by the regulations from taking into account. Therefore, this issue will have to be further addressed by the parties.

A separate order is being entered herewith delineating the rulings made in this opinion.

---

**20.** 21 C.F.R. § 630.13(a) is the successor to 42 C.F.R. § 73.113(b). Section 630.13(a) was the regulation in effect in the early 1980's when

ORDER

For the reasons stated in the opinion entered herein, it is this 12th day of July 1990

ORDERED

1. Plaintiffs' motion for partial summary judgment is denied;

2. The United States' motion for partial summary judgment is granted as to:

a. Plaintiffs' claim concerning the failure of Lederle, Inc. to submit data required by 42 C.F.R. § 73.110(b)(2)(i);

b. Plaintiffs' claim concerning the alleged insufficiency of data submitted to the Division of Biologic Standards ("DBS") under 42 C.F.R. § 73.110(b)(2)(i);

c. Plaintiffs' claim concerning the alleged failure of Lederle to submit proper neurovirulence data pursuant to 42 U.S.C. § 73.110(b)(1)(iii);

d. Plaintiffs' claim concerning the alleged violation of 42 C.F.R. § 73.116(c) arising from DBS' approval of Lederle's strains under 42 C.F.R. § 73.110(b)(2)(ii);

e. Plaintiffs' claim concerning the fact that DBS did not evaluate the seeds from which Lederle's initial lots of vaccine were produced;

f. Plaintiffs' claim concerning the alleged violation of 42 C.F.R. § 116(c) arising from DBS' approval of and failure to retest seed 45 B 85;

g. Plaintiff's claim concerning the fact that the strain from which seed 45 B 85 was developed was not subjected to tests prescribed by 42 C.F.R. §§ 73.110(b)(3) and 73.110(b)(4); and

h. Plaintiffs' claim concerning DBS's approval of seed 45 B 165 despite alleged improprieties in the issuance of a product license to Pfizer, Ltd.; and

3. The United States' motion for partial summary judgment is otherwise denied.

Lederle approved the use of seed 45 B 165, and it remains in effect today.